[831 NYS2d 1]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SANTE KIMES, Appellant.

First Department, December 7, 2006

2

4

## APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Joseph M. Nursey* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Hilary Hassler* and *Eleanor J. Ostrow* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

The arrest and trial of Sante Kimes and her son, Kenneth, on charges of murdering a wealthy widow in order to defraud her of a multi-million-dollar Upper East Side townhouse captured the attention of the country. From the moment 82-year-old Irene Silverman disappeared through the eventual trial and convictions for her murder, the two modern day grifters were the subjects of intense media scrutiny in newspapers, newsmagazines and on television news shows.

They were the subjects of at least one made-for-TV movie. Three books were published about the duo, described by one popular weekly magazine as a "one-family crime tsunami linked to a cross-country trail of cons, insurance scams, arson, missing persons and murder."[1] A book by Reuters reporter Jeanne King presumed to encapsulate their unsavory story in its title, "Dead

---

1. People Weekly magazine, July 27, 1998.

End: The Crime Story of the Decade—Murder, Incest and High-Tech Thievery."[2]

Even though Silverman's body was not found, the People brought mother and son to trial for murder on circumstantial evidence that gave new life to the traditional maxim that circumstantial proof will often paint a far stronger picture of guilt than direct evidence. Subsequently, Kimes and her son were found guilty of multiple counts of murder in the second degree, robbery and burglary in the first degree, criminal possession of a weapon in the second and third degrees, 16 counts of forgery in the second degree, criminal possession of a forged instrument in the second degree, 29 counts of eavesdropping, criminal possession of stolen property in the third degree, conspiracy in the fourth degree and attempted grand larceny in the first degree. Kimes and her son were sentenced on the same date to aggregate terms of 120 years to life. Sante Kimes now appeals from the judgment.[3]

On appeal, Kimes challenges the legal sufficiency of her murder conviction; the court's pretrial *Huntley*, *Batson* and *Sandoval* rulings and the denial of her request for a *Darden* hearing; the admission of certain evidence at trial including incriminating notebooks; certain restrictions on the cross-examination of prosecution witnesses; the discharge of a sick juror; the adequacy of the court's inquiry into a claim of juror misconduct; that the trial court overlooked a possible *Brady* violation; that one of her lawyers had a conflict of interest; that the court interfered with her right to counsel by suspending her jailhouse telephone privileges; and that she was deprived of her right to be present at a critical stage of the proceedings.

### The Legal Sufficiency of the Murder Conviction

■ At the outset, we note that Kimes does not challenge the sufficiency of the evidence underlying the majority of her convictions evidently recognizing that the counts of conspiracy to steal Silverman's home and the attempted theft of it were proven overwhelmingly by both direct and circumstantial evidence. On appeal, Kimes challenges the legal sufficiency only of her convictions for murder, as well as burglary and robbery in the first degree; each of which required a showing that she caused, at least, physical injury to Irene Silverman.

---

2. Published by M. Evans & Co. Inc. (2002)
3. Her son waived his right to appeal in exchange for being allowed to serve his sentence in California.

Kimes asserts that there is no physical nor forensic evidence that either Kimes herself or acting in concert with her son inflicted any physical injury on Ms. Silverman, or that she was the last person to see Silverman before her disappearance. She also asserts that there were no witnesses who observed Ms. Silverman in the presence of either Kimes or her son on the day of her disappearance. She further asserts that according to the trial testimony, the last witness to see Ms. Silverman was her employee Martha Rivera who was also the person who discovered her missing on the evening of July 5, 1998. Additionally, Kimes correctly maintains that there was no physical evidence of Ms. Silverman's presence in the car that her son, Kenneth Kimes, drove on the day of Silverman's disappearance, or in the apartment (hereinafter referred to as Apartment 1B) which Kenneth rented in Silverman's townhouse.

Kimes acknowledges, however, that certain evidence supported a finding of motive for homicide. She also concedes that homicide may be proved solely by circumstantial evidence. (*See People v Bierenbaum*, 301 AD2d 119 [1st Dept 2002], *lv denied* 99 NY2d 626 [2003], *cert denied* 540 US 821 [2003].)

In assessing the legal sufficiency of trial evidence our standard of review is that while viewing the evidence in a light most favorable to the People, we must determine whether the guilty verdict is based on any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the factfinder at trial. (*See id.* at 131, citing *People v Williams*, 84 NY2d 925, 926 [1994].)

The testimony and evidence at trial revealed the following:

In 1998, Silverman owned, and lived in, an $8 million townhouse on East 65th Street between Madison and Fifth Avenues; she rented apartments within the townhouse to business executives and patrons of the arts on short-term visits to the city. She was aided by a staff of employees. She kept large sums of cash in her personal apartment on the first floor and invariably carried with her a large and readily identifiable set of keys to all the townhouse doors.

In the spring of 1998, Silverman was in perfect mental and physical health. She left the townhouse infrequently and only in the company of a staff member; she maintained an active social life by entertaining her many friends at the townhouse. She was financially secure. The townhouse was Silverman's pride and joy. She had created an arts foundation in honor of her deceased mother and bequeathed the townhouse and its contents to the foundation upon her death.

Kimes and her son were in significantly different circumstances. From 1994, after Kenneth Kimes, Sr. died, Kimes and her son urged various people in their employ (whom they recruited from homeless shelters or by advertising on Salvation Army bulletin boards) to secure personal identification documents for themselves. Over the course of time, those documents were stolen from each employee. In March 1998, Kimes and her son passed a bad check to steal a Lincoln Town Car from a Utah car dealer. At the same time, they contacted Stanley Patterson, who helped them relocate to California and sold them three guns, including a 9 millimeter Glock and a .22 caliber Beretta.

In April 1998, Kimes and son relocated to Florida where, as the evidence indicates, they hatched their scheme to murder Silverman in order to steal the townhouse from her. Kimes, using an alias contacted a Florida title company, confirmed that Irene Silverman was the sole owner of the Manhattan property at 20 East 65th Street and that the property was free of liens. Shortly thereafter, they stole a number of identification cards from Dr. Tony Tsoukas.

In May 1998, they made telephone contact with Silverman, in a bid to have Kenneth lease an apartment from her. Kimes, posing as "Ava Guerra," dropped the name of Silverman's friend, Rudy Vaccari, and managed to secure Apartment 1B for lease to Kenneth under the guise of "Manny Guerrin." Silverman's business manager, Valerie McLeod, arranged to have "Manny" move in Monday, June 15.

On or about Saturday, June 13, Kimes, her son and Jose Alvarez, an employee of the Kimeses, loaded up the stolen Lincoln in Florida and headed for Silverman's townhouse in New York City. As they drove through New Jersey, Kenneth pointed out a grassy spot off the highway and remarked to his mother that it would be a "perfect place to dump a body."

Although Kenneth Kimes arrived at the townhouse a day earlier than planned, Silverman and Rivera allowed him to move into Apartment 1B. Silverman was immediately suspicious of "Manny" and stated that "he smells like jail." Unbeknownst to them, Kimes moved into the apartment with her son. On Monday morning, Kenneth left the Lincoln in a local parking garage.

Over the course of the next few weeks, Kimes and her son set up eavesdropping devices on Silverman's telephone line, and Kenneth questioned her house staff in an effort to learn as

much as they could about Silverman and her household routines and schedules.

On June 18, a friend of Kenneth's visited him and Kimes in their apartment at Silverman's townhouse. Kimes confided that she and Kenneth were thinking of buying the building. Over the course of the next week, "Manny" met with Valerie and tried to learn Silverman's Social Security number from her. Tensions in the household continued to mount between Silverman and "Manny," and Silverman resolved that he could not stay there after all. Meanwhile, Kimes and son gathered property transfer forms, including a deed of sale which would be needed for the fraudulent transfer of Silverman's townhouse. For the fraud to pass muster, however, they needed to obtain Silverman's Social Security number, and Kimes made concerted efforts to obtain it.

Kimes and son then forged Silverman's signature on the deed of sale for the townhouse and began scouting for a notary who would authenticate the forged signature. One notary public who came to Apartment 1B was greeted by the sight of Kimes wearing a nightcap and nightgown posing as a bedridden Silverman. This notary refused to notarize Silverman's signature on the deed.

On July 2, 1998, Kenneth brought another notary, Noelle Sweeney, to Apartment 1B. Once again, Kimes posed as an infirm Silverman, donning a frilly nightgown and a nightcap over a red wig. Although Sweeney did not actually see the woman sign the deed, Sweeney notarized the Silverman signature on the document. Kenneth signed another real estate document, and Sweeney notarized that signature as well.

Kimes and son began recruiting people, including Stanley Patterson, to manage the townhouse once they completed the fraudulent transfer of ownership and disposed of Silverman. Unbeknownst to them, however, Patterson was already cooperating with law enforcement efforts to find Kimes and her son in connection with a Utah warrant issued for the stolen Lincoln. Patterson agreed to meet the duo in New York on Sunday, July 5, and he informed the authorities about this.

In the meantime, posing as John Kline, Kenneth had a check sent for $8,000 from an offshore account held in the name of The Atlantis Group, a fictitious company that Kenneth had set up in March solely for the purpose of the fraudulent transfer. Then, posing as "Manny," he and Kimes tendered the check for $8,000 to Chase Manhattan Bank in order to receive two certi-

fied bank checks, payable to the New York City Department of Finance, to cover the transfer and property taxes on the sale of the townhouse.

On Friday, July 3, "Manny" confirmed with Silverman's housekeeper that the only people who would be in the townhouse that Sunday were Silverman and Martha Rivera, who stayed at the townhouse on the weekends. On Saturday, July 4, Silverman directed Jeff Feig, the building manager, to serve "Manny" with a letter of eviction on Monday morning. During a July 4 dinner party at the townhouse, Silverman confided in close friends, that she planned to evict "Manny" on Monday.

On the morning of Sunday, July 5, Rivera left Silverman alone in her office at the townhouse at 11:45 A.M. Over the course of the next several hours, Rivera did not hear from Silverman and assumed she was napping. Between 2:30 and 4:00 P.M., Rivera had two "odd" telephone conversations with "Manny" and a third telephone conversation with a woman who advised her to return to her own home and to take Silverman's dog with her.

At 4:42 P.M., Rivera went to Silverman's apartment, banged on the door but got no answer. The police were then summoned. Silverman was not in the apartment, and the stacks of cash she kept in her office closet were also missing.

With police assistance, the townhouse was searched but Silverman was nowhere to be found. With the police in tow, friends who had arrived to help with the search then entered "Manny's" locked apartment. "Manny's" belongings were gone, as were a large pillow and comforter missing from the bed. However, he had left behind an opened roll of duct tape, a box of 42-gallon trash bags with four bags missing, and a shower curtain without its liner.

Meanwhile, federal agents of the fugitive task force were planning to arrest Kimes and her son with the help of Stanley Patterson. On Sunday July 5, at 11:00 A.M., Patterson, accompanied by agents, had arrived at the Hilton Hotel, where he was supposed to meet mother and son. At about 11:30 A.M., Kimes called Patterson at the Hilton to tell him that she and her son were having car trouble on the Garden State Parkway and would be delayed. Before meeting Patterson, Kimes checked a black duffel bag at the Plaza Hotel. At 5:00 P.M., she met Patterson at the Hilton Hotel, where she instructed him on his duties as the new manager of the townhouse. At 6:40 P.M., Kenneth parked the stolen Lincoln at a garage on West 44th Street, after which he joined his mother and Patterson near the Hilton

Hotel. At 7:20 P.M., agents arrested Kimes and her son on the Utah warrant.

The federal task force members, unaware of Silverman's disappearance, processed both Kimes and son on the Utah warrant. Kenneth had identification in the name "Manuel Guerrero" and numerous documents in the name "Irene Silverman." He had a knife and brass knuckles on his person; he also had a parking stub from a garage and what turned out to be Silverman's personal set of townhouse keys. Kimes's black vinyl bag contained more than $10,000 in cash and a host of documents bearing Silverman's name, and a surgical glove.

That same night, one of the federal agents traced the parking stub recovered from Kenneth Kimes to the stolen Lincoln. The agent impounded the vehicle and brought it to FBI headquarters. He then learned that Silverman was missing, and he informed the New York Police Department (NYPD) about the arrest. Subsequently, Detective Thomas Hackett spoke with Kimes to ascertain Silverman's whereabouts. Kimes denied knowing Silverman, and suggested that perhaps the missing woman was "out walking her dog." Hackett searched Kimes's bag and found documents including a claim check for the Plaza Hotel.

A search of the back seat of the Lincoln revealed incriminating documents in Silverman's name, blank legal forms (a will and a quitclaim deed), notebooks and other items. The items included a can of Mace, handcuffs, a jar of sedatives, rubber gloves, black garbage bags, an empty stun gun box and semiautomatic handgun with ammunition. The trunk, in contrast, contained only an empty duffel bag, large enough to hold the body of a six-foot-tall individual. Detectives also lifted prints in Apartments 1A and 1B. From Apartment 1B they recovered two rolls of duct tape, some discarded duct tape, a shower curtain, an open box of heavy duty garbage bags, and an unopened package of clothesline.

In the meantime, Lawrence Frost, an investigator employed by Kimes's attorney, went to the Plaza Hotel and retrieved the duffel bag Kimes had checked there on July 5. After examining its contents, which included a loaded Beretta, the investigator stored the bag at his brother's place of business. Detectives immediately served the investigator with a subpoena for the bag and, shortly thereafter, had the bag in their custody.

The duffel bag's contents were inventoried at the District Attorney's Office in the presence of the defense attorneys. The

bag contained the loaded .22 caliber Beretta and numerous incriminating pieces of evidence. Among those items was a folder entitled "The Final Dynasty," which included the notarized deed, notarized transfer tax form, and all the other documents needed to finalize the theft of Silverman's townhouse.

On July 24 and September 10, 1998, the police conducted lineups. The fingerprints of Kimes and her son were found in and around Apartment 1B and on a variety of documents recovered from the Lincoln. Silverman's signatures on all of the documents in the "Final Dynasty" folder, including the deed and the transfer tax form, were not genuine according to John Osborn, a forensic document examiner. In several instances, the signature appeared to be traced from the June 14 rental receipt which Silverman had signed and given to Kenneth.

Substantial uncontroverted testimony demonstrated that Silverman was a creature of habit. She had not slept away from her house in more than 15 years. She rarely left the house and when she did, she was always accompanied by one of her staff members. Further, the evidence demonstrated that Silverman was healthy and maintained many ongoing social relationships. She was not an Alzheimer's patient who could have wandered off. In fact, the evidence shows that the night before her death, Silverman made plans to see two of her close friends within a week. She also planned to have her staff on hand on the following Monday morning in order to evict Kenneth Kimes. The fact that Silverman disappeared without a trace on a quiet Sunday morning and was not found despite intensive efforts by the police, strongly pointed to the conclusion that Silverman did not disappear voluntarily and was a victim of foul play.

The evidence that Kimes and her son had a motive to kill Silverman is similarly compelling. The evidence shows that Kimes and her son wanted Silverman's house; that Silverman would have never willingly given up the house to them; and that Silverman had plans to leave the house to a charitable foundation she had established in memory of her mother. The directors of the foundation would not benefit personally from Silverman's death. However, Kimes and her son would benefit from her demise. They had arranged for transfer of the townhouse to their shell corporation. However they could not assume full control of the property and reap the benefits of the townhouse if Silverman were still alive. Silverman, although aging, was in full control of everything that occurred within the townhouse. Kimes and her son knew Silverman would not allow them to

take over her townhouse so long as she was alive. Based on the foregoing evidence, therefore, a jury could rationally conclude that defendant and her son had a motive to kill Silverman.

However, more than motive was established by the evidence introduced at trial. A jury could also rationally conclude that Kimes and her son had the opportunity as well as the means to kill Silverman. Martha Rivera testified that she last saw Silverman at 11:45 A.M. on July 5 and that she realized that Silverman was missing at 4:45 P.M. that same day. Cell phone records permit the inference that Kimes and her son were at 20 East 65th Street on July 5. The records show two calls made from their cell phone to the Plaza Hotel. Those calls were made from inside the townhouse or within the immediate vicinity of the townhouse at 11:06 and 11:26 A.M. The testimony demonstrates that at the time of Silverman's disappearance, the only person at the townhouse other than Kimes and her son was Rivera. The testimony reveals that Rivera was busy with chores from 11:45 A.M. onward and that while she did her chores, loud music was playing. The motive of Kimes and her son to murder Silverman coupled with their exclusive opportunity to do so on July 5 could easily lead a rational finder of fact to find them guilty of the murder of Silverman.

Moreover, evidence established that Kimes and her son were also well equipped to murder Silverman. Various instruments that would assist in the murder and disposal of a person were found in their car and in the bag that had been checked at the Plaza Hotel. These instruments included but are not limited to two loaded guns, an empty stun gun box, drugs, syringes, large heavy duffel bags, duct tape and masks. Further evidence was found within Apartment 1B such as an open roll of duct tape, bearing Kenneth Kimes's prints, four heavy duty garbage bags missing from a box of 10 and a shower curtain missing a plastic liner.

While there was no evidence of a struggle at Silverman's house, the evidence also established that Kimes and her son could have easily overpowered Silverman without a struggle. Silverman was 82 years old, four feet, eight inches tall and weighed a mere 115 pounds. Kenneth was six feet tall and weighed 190 pounds and Kimes was five feet, five inches tall and weighed 200 pounds. They could have overpowered Silverman with sheer bodily force. Moreover, they possessed various tools for overpowering Silverman, such as a stun gun and sleeping drugs.

Finally, if any doubts remained as to the guilt of Kimes, these were laid to rest with the evidence of possession of Silverman's property, including Silverman's distinctive townhouse keys, her Social Security card and documents with her name on them, following her disappearance.

Accordingly, we find the evidence legally sufficient to sustain Kimes's conviction for murder, robbery and burglary.

### Pretrial rulings challenged by Kimes

#### 1. The request for a *Darden* hearing was properly denied

 Search warrants were issued for, inter alia, Apartment 1B, the Lincoln, mailboxes rented by Kimes and her son, and data from Kimes's cellular phone. In her pretrial omnibus motion, Kimes requested a *Darden* hearing in order to determine the existence and identities of the informants upon whose information the search warrants had been issued. The identities of four of the informants (associates and employees of Silverman) were kept confidential before the trial and they were not presented to the issuing judge at the time the warrants were signed.

The court denied Kimes's application for a *Darden* hearing, saying there was no possibility the informants were fictitious since most of them had testified under oath before the grand jury. On appeal, Kimes argues that she was improperly denied a *Darden* hearing.

The purpose of a *Darden* hearing is to protect defendants from informants who may have been wholly imaginary and from communications that are entirely fictitious. (*People v Darden*, 34 NY2d 177, 182 [1974]; *and see People v Serrano*, 93 NY2d 73 [1999].) This is especially important in cases where an informant's information is the sole basis for probable cause for an arrest.

In *People v Edwards* (95 NY2d 486 [2000]), the Court carved out exceptions to the *Darden* rule, and stated that a hearing is not required in cases where the informants have previously testified before the judge who issued the warrant "since their existence and statements have already been verified." (*Id.* at 493.)

In this case, while they did not testify before a judge, all four informants testified before the grand jury. Moreover, all four informants subsequently testified, and were subject to cross-examination at trial, thus the objectives of a *Darden* hearing were fully accomplished during the trial. (*See People v Hamil-*

*ton*, 227 AD2d 669, 671 [3d Dept 1996], *lv denied* 88 NY2d 1068 [1996].) Thus, we uphold the trial court's denial of a *Darden* hearing.

## 2. The suppression of Kimes's statement was properly denied

■ In a *Huntley* hearing, Kimes moved to suppress the statements she made to NYPD Detective Hackett on July 7, 1998 when the NYPD was attempting to locate Silverman. The court ruled that Kimes's constitutional rights were not violated by Detective Hackett's continued inquiries even though Kimes had invoked her right to counsel.

At trial, Hackett testified that Kimes denied knowing Silverman or anything about the case. He said that during the interview she looked very smug and when he showed her an article in The Daily News about Silverman's disappearance, she said, "how do I know this paper is for real?" She then suggested that Silverman could be "out walking her dog." On appeal, Kimes claims that her statements to Hackett should have been suppressed because he continued to question her after she asked for a lawyer, and he interrogated her in a coercive manner. We disagree.

Under New York's emergency exception, police officers can continue to question a defendant even after the defendant has requested an attorney if an individual's life or safety is at stake. (*People v Krom*, 61 NY2d 187 [1984].) Like the victim in *Krom*, Silverman disappeared from her home without a trace. The circumstances surrounding Silverman's disappearance were highly suspicious. When Hackett learned that Kimes had been taken into custody and that she had some of Silverman's personal belongings, he questioned her exclusively about Silverman's whereabouts. Under these circumstances the "emergency exception" was correctly applied and Kimes's statements were properly admitted at trial. We further conclude that the safety exception discussed in *New York v Quarles* (467 US 649 [1984]) applies to a situation where a suspect has invoked the right to counsel, and that it also applies to the type of emergency presented here.

Nor was suppression of Kimes's statements to Hackett warranted upon the ground of involuntariness. In determining voluntariness, a court must review all of the surrounding circumstances to see whether a defendant's will was overcome. (*People v Mateo*, 2 NY3d 383, 413 [2004], *cert denied* 542 US 946 [2004]; *People v Anderson*, 42 NY2d 35 [1977].) In this case, Kimes was not restrained in any way or denied sleep for any extended pe-

riod. Further, Kimes did not appear afraid of Hackett; in fact, according to Hackett's testimony, credited by the hearing court, she appeared "smug" during the questioning. There is nothing in the record to suggest that her will was overborne by the surrounding circumstances.

In any event, any error in admitting Kimes's statements to Hackett at trial, would have been harmless. (*See People v Paulman*, 5 NY3d 122 [2005].) There was a veritable mountain of independent testimonial, physical, and documentary evidence that connected Kimes to the death of Silverman. The statements she made to Hackett were a very minor part of the trial evidence and did not directly link her to the crimes with which she was charged.

3. The victim's hearsay statements were properly admitted

██ In an in limine hearing, the court ruled in favor of the People on the admissibility of certain hearsay statements made by Silverman to her friends and staff prior to her disappearance. Those statements included the victim expressing her feelings and fear of the new tenant, Kenneth Kimes (Manny); asking an employee to end his vacation early because she was suspicious of the new tenant; asking the manager of her building (Feig) to write a letter instructing "Manny" to leave immediately. Also admitted were statements that served to establish that she had no future plans to travel or to sell her townhouse. For example she told her seamstress she would see her the following Wednesday; and her attorney testified that Silverman never said anything about selling her townhouse.

In granting the motion, the court noted that statements with regard to Silverman's "attitude and feelings" about "either or both defendants" were admissible to show state of mind and future intent regarding "what Silverman's actions were likely or not likely to be." The court also instructed the jury that the evidence was to be used for the limited purpose of establishing Silverman's "feelings and attitude." On appeal, Kimes argues that the testimony of Silverman's staff and friends was inadmissible hearsay. She also contends that admission of this evidence violated her state and federal rights to confront and cross-examine the People's witnesses.

At the outset, we note that any issue of whether evidence admitted at trial denies a defendant's constitutional right to confrontation must be raised before the trial court. (*People v Kello*, 96 NY2d 740 [2001].) Kimes did not raise her constitutional claims at trial. Her objection to the admission of the state

of mind evidence made no reference to the Confrontation Clause. Therefore, these claims are unpreserved, and we decline to review them in the interest of justice.

Moreover, we find that the trial court ruled correctly on the admissibility of the hearsay statements. While out-of-court statements are generally not admissible for the truth of the matter asserted (*People v Huertas*, 75 NY2d 487, 492 [1990]), they are not excluded as hearsay when the declaration is relevant for another purpose. (*See e.g. Loetsch v New York City Omnibus Corp.*, 291 NY 308 [1943].)

Silverman's declarations to her friends and staff are compelling evidence of how she felt about her tenant "Manny" (Kenneth Kimes) and what her intentions were with respect to her townhouse. Even if Kenneth Kimes was not the "suspicious criminal" or "thief" Silverman described to her staff and friends, the testimony of Silverman's dislike is relevant because it shows her distrust of Kenneth Kimes. Such evidence demonstrates that Silverman was most unlikely to transfer title to her townhouse voluntarily to him and his mother, and was not excludable as hearsay.

Kimes further argues that the testimony of Silverman's friends and employees does not fall within the state-of-mind exception established in *Mutual Life Ins. Co. v Hillmon* (145 US 285 [1892].) This exception to the hearsay rule allows out-of-court statements that demonstrate the declarant's intent to perform an act in the future to be admitted at trial so long as such intent illuminates a material issue at trial. (*See also People v James*, 93 NY2d 620 [1999].) Kimes argues that the state-of-mind exception only applies when the out-of-court statement involves an intent to act in the future, as opposed to an intent to *not* act. Citing to *Hillmon* for this proposition, Kimes claims that because Silverman's statements revealed an intent *not* to sell her townhouse and an intent *not* to travel, they were inadmissible. Kimes claims that the state-of-mind exception "is not intended to permit admission of hearsay evidence of a declarant's purported statements for the . . . unreliable purpose of demonstrating that the declarant would not have acted in any other way and, thus she must have fallen victim to the entirely independent criminal intervention of someone else." We disagree.

This Court adopted the *Hillmon* rule in *People v Malizia* (92 AD2d 154, 160 [1983], *affd* 62 NY2d 755 [1984], *cert denied* 469 US 932 [1984]), in which we held that out-of-court statements

regarding future intent are only, admissible where the statement is made under circumstances that make it probable that the expressed intent is a serious one, and it is realistically likely that the purportedly intended event would take place. In other words, the exception is justified when the circumstances in which the declarations are made provide an independent basis for assessing the reliability of the declarations as indicia of future conduct, whether that conduct consists of acts or omissions. (*See also People v Chambers*, 125 AD2d 88 [1st Dept 1987], *appeal dismissed* 70 NY2d 694 [1987].)

In this case, the circumstances of record support the admission of the victim's statements to show her intent with respect to her residence: Silverman, an 82-year-old woman who had not slept away from her apartment in 15 years, stated she had no plans to travel. She had bequeathed her house to a foundation established in honor of her mother, stating that she did not plan to sell her townhouse. When viewed in this light, Silverman's statements to family and friends appear to be reliable indicia of her future conduct respecting the townhouse. Therefore, pursuant to *Hillmon*, they were admissible.

4. The trial court's *Sandoval* ruling was fair and proper

 At the *Sandoval* hearing, the People presented an extensive list of Kimes's prior crimes and bad acts which they intended to utilize for impeachment if Kimes testified on her own behalf. These dated back to a 1961 California conviction for petty theft, and included a 1974 California conviction for theft, a 1985 Washington, D.C. conviction for grand theft, and 1986 federal convictions for involuntary servitude, conspiracy, transporting illegal aliens, and escape. The bad acts about which the People sought to inquire included forgery, insurance fraud (arson), theft, intimidation, harassment, conduct respecting people who had disappeared, attempted drugging of individuals and filing a false lawsuit.

The People also sought to inquire about the underlying facts of the 1986 federal conviction, which essentially established that Kimes for a period of seven years enticed young girls from Mexico and El Salvador with promises of wages and a better life. Once the girls arrived in the United States, Kimes forced them to work seven days a week without pay while threatening and beating them.

The court ruled the People could not inquire about threats Kimes had made or her alleged attempt to drug another person or anything having to do with the disappearance of various

people because "that subject was too close to this case." But the court permitted the People to inquire about the 1986 convictions including the underlying facts, because "there was an extraordinary amount of deception involved in the execution of those crimes."

On appeal, Kimes contends that the trial court's ruling was an abuse of discretion because involuntary servitude raised "inflammatory racial" connotations, that the conviction was old and that Kimes was the only person who could testify in her own defense. Kimes's arguments are partially unpreserved (e.g., at the hearing she complained only that the conviction for involuntary servitude might engender a "natural bias" against defendant among jurors) and, in any event, without merit.

There are no per se rules requiring preclusion because of the age, nature and number of a defendant's prior crimes. (*People v Walker*, 83 NY2d 455, 459 [1994].) The Court of Appeals has "declined to prohibit impeachment simply because of the potentially inflammatory impact of the prior crime." (*People v Hayes*, 97 NY2d 203, 208 [2002].)

The People observe that, "given how many crimes defendant committed, and how probative they were to her credibility, the court's Sandoval ruling was a model of restraint." We agree, and thus find that the court acted well within its discretion.

## The Trial: Juror Issues

### 5. Kimes's peremptory challenges were properly disallowed

■ During the first round of jury selection, Kimes exercised peremptory challenges against all six of the white panelists. These panelists were then excused from service. In the second round, Kimes made peremptory challenges against the next two available white jurors, Reape and Belladonna. The People, pursuant to *Batson v Kentucky* (476 US 79 [1986]), objected to the challenges against Reape and Belladonna, arguing that Kimes had challenged an excessive number of white jurors during the first and second rounds. The court conducted a *Batson* hearing and concluded that defense's reasons for challenging Belladonna and Reape were pretexts for racial discrimination. The court seated the two jurors.

On appeal, Kimes argues that the People failed to show that the peremptory challenges against Belladonna and Reape were discriminatory. We disagree, and uphold the trial court.

A litigant has a statutory right to exercise a peremptory challenge against a potential juror. (CPL 270.25 [1].) Such a chal-

lenge may not be disallowed unless it falls within the narrow exception of unlawfully discriminatory challenges. (*Matter of Mortillaro v Posner*, 147 AD2d 701 [2d Dept 1989].)

It is well settled that a party may not consider the race of a prospective juror in deciding whether that individual ought to serve on a jury. (*Batson v Kentucky, supra*.) The use of peremptory challenges for discriminatory purposes, such as to exclude persons of a particular race from serving on the jury, is forbidden by the Equal Protection Clause of the Fourteenth Amendment (*id.*), as well as Equal Protection Clause of our State Constitution. (*People v Kern*, 75 NY2d 638 [1990].)

In the three-step analysis where (1) a party raises a *Batson* challenge and establishes a prima facie case of discrimination, and (2) the party opposing the challenge proffers race-neutral reasons for its challenges, it is up to the trial court (3) to make a determination as to whether the race-neutral reasons for the peremptory challenges are merely a pretext for discrimination. (*Batson*, 476 US at 95 [when circumstances suggest the need, the trial court must undertake a "factual inquiry" that "takes into account all possible explanatory factors"].) At this third step, trial courts "are authorized to act on outlandish or entirely evanescent assertions, even if they appear race neutral on their face." (*People v Payne*, 88 NY2d 172, 183 [1996].) Further, the trial court's responsibility is to make a sufficient record to allow for meaningful appellate review as well as to "reflect[ ] the basis for their rulings." (*Id.* at 184.)

In the case at bar, the People made a prima facie showing of discrimination by showing that Kimes used peremptory challenges to exclude every white panelist in the first round of jury selection and the first two white panelists in the second round. Upon the People's motion for the *Batson* inquiry, the court noted it had been "aware" and "concerned" about what it perceived as a pattern of discrimination in the defense challenges and asked the defense to explain the basis for its strikes.

The defense provided race-neutral reasons for challenging the potential jurors. Kimes claimed that Reape and Belladonna were stricken because they both admitted discussing their potential jury service with their families. Further, Kimes claimed that Reape was a former business owner and that "every retail owner is always concerned about the possibility of theft and a violent robbery." Kimes also did not like Reape's response when asked about her sentiments regarding the case because Reape said she felt like an Army volunteer. As for Belladonna, in Kimes's

estimation, the potential juror had a "cavalier attitude" towards jury duty.

Considering the pattern of discrimination in the first round, the court concluded that the strikes against Reape and Belladonna were racially motivated and sat the two jurors on the jury. The court noted that while both jurors had discussed the case with family, they only discussed scheduling matters and had not discussed the actual substance of the case. The court also pointed out that Reape had not worked in years.

On appeal, Kimes, relying on *Payne*, claims that the People failed to show that her peremptory challenges to Belladonna and Reape were discriminatory. She claims that the People did not meet their burden because they failed to address *all* of the race-neutral reasons she proffered for her peremptory challenges.

The prosecution was under no obligation to address all of the race-neutral reasons that were proffered in order to carry its burden of proving pretext. Pretext can be found without the moving party, in this case the People, addressing any of the race-neutral reasons proffered by the striking party. In *Payne*, the Court of Appeals held that a trial court may render a ruling of purposeful discrimination "without hearing more discussion from either or each side" after the striking party has proffered its race-neutral reasons. (*Payne*, 88 NY2d at 184; *see also People v Smocum*, 99 NY2d 418 [2003].)

This Court has consistently held that the disparate treatment of panelists with similar characteristics can evince that a proffered reason for a juror's exclusion is pretextual. (*See People v Lozado*, 303 AD2d 270 [1st Dept 2003], *lv denied* 100 NY2d 563 [2003]; *People v Smith*, 303 AD2d 206 [1st Dept 2003], *lv denied* 100 NY2d 543 [2003].)

In the case at bar, the prosecution, having already pointed to instances of disparate treatment of similar panelists in the first round, indicated that Reape and Belladonna were not being treated in the same way as minority panelists with similar characteristics. For example, Reape and Belladonna were not the only jurors who had discussed their jury service with their families. The prosecution clearly met its burden of demonstrating pretext. Moreover, given the finding of pretext in one reason, it was unnecessary for the court to address all of the race-neutral reasons Kimes proffered for her challenges.

We find that the court afforded both the People and the defendant a sufficient opportunity to make the necessary record,

and see no ground to disturb its rejection of Kimes's preferred race-neutral reasons (*see People v Jones*, 297 AD2d 256 [1st Dept 2002]), particularly since that ruling depended heavily on the court's credibility determinations and independent assessment of the panelists' demeanor. (*People v Turner*, 294 AD2d 192 [1st Dept 2002], *lv denied* 98 NY2d 732 [2002]; *People v Sutton*, 288 AD2d 115 [1st Dept 2001], *lv denied* 97 NY2d 709 [2002].)

## 6. The court's inquiry into juror misconduct was sufficient

During the trial, the judge received information through her clerk that a woman, a "self-styled psychic petfinder," who had been attending the trial had reported overhearing jurors speaking in the courthouse bathroom. Several jurors allegedly had said that they were "spooked" by defendants. They also allegedly said that one of the lawyers was stupid.

The defense attorneys argued that the court should question the woman about the conversation she claimed to have overheard. The prosecution argued that the court should simply question the jurors. The court questioned the jurors individually, asking if the juror had shared with any other juror, or overheard any negative views about either of the defendants or any of the lawyers that would prevent him/her from being fair to the defendants and keeping an open mind until the end of the case. All but five of the jurors and alternates said they had not heard or shared any negative views. Each of the remaining five admitted to talking about the attorneys but said they could remain fair to the defendants.

Kimes contends that the court erred in refusing to interview the woman who overheard the remarks. Kimes, citing *People v Buford* (69 NY2d 290, 299 [1987]), also contends that the court should have made a more detailed inquiry of the jurors to determine "what the juror[s] ha[d] seen, heard, or ha[d] acquired knowledge of." We disagree.

The trial court has discretion in its investigation of alleged juror misconduct. (*See People v Echevarria*, 17 AD3d 204, 205 [1st Dept 2005], *affd* 6 NY3d 89 [2005].) When a court is confronted with an allegation that a juror is grossly unqualified or engaged in substantial misconduct, "the trial court must question each allegedly unqualified juror" before reaching a conclusion as to whether to keep or discharge the juror. (*Buford*, 69 NY2d at 299.) The inquiry must be "probing and tactful," and should be geared to ascertaining whether the juror has heard or seen or acquired knowledge of something that

might prevent him or her from rendering an impartial verdict in the case. (*Id.*)

We find that the court conducted a sufficient inquiry of each juror. The jurors' responses to the court's inquiry showed that they had not shared any negative views about Kimes, her son, or the attorneys that might have compromised their ability to reach a fair and impartial verdict.

## 7. The discharge of a sick juror was proper

■ Towards the end of the trial, on May 15, 2000, the uncle of juror number 4 called to say that juror number 4 had been taken to the hospital because he could not breathe. The uncle said that he did not believe the juror would be able to appear that day.

At 10:30 A.M., the court determined that there was no reasonable likelihood that juror number 4 would return by 11:30 A.M.; it therefore discharged him, invoking the two-hour provision of CPL 270.35 (2) (a). Juror number 4 was ultimately diagnosed with pneumonia and was admitted to the hospital.

Kimes argues that the trial court erred in discharging the juror and submitting an alternate because the judge did not conduct a "reasonably thorough inquiry" (*see* CPL 270.35 [2] [a]) into why the juror was absent, and as a result, she was denied her constitutional right to a jury of her choosing. (*See People v Jeanty*, 94 NY2d 507, 517 [2000].)

This argument is utterly devoid of merit. CPL 270.35 (1) provides that a trial court may replace a sworn juror, without a defendant's consent before the jury begins its deliberations, if the juror "is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service." CPL 270.35 (2) (a) further states that "the court shall make a reasonably thorough inquiry" about a juror's illness; it does not mandate a particular means of making such inquiry. The Court of Appeals has held that the "two-hour rule" gives the court broad discretion to discharge any juror whom it determines is not likely to appear within two hours. (*People v Jeanty*, 94 NY2d at 517.)

Since the court's conclusion was that there was no reasonable likelihood that the juror would appear within two hours, it was well within the judge's discretion to discharge the sick juror and substitute an alternate. Furthermore, contrary to Kimes's claim, she was not "denied her constitutional right to a jury of her choosing" because she had a voice in choosing the alternates as well as the regular jurors. (*Id.* at 518.)

## The Trial

### 8. Notebooks admitted into evidence did not violate Kimes's Fifth Amendment or attorney-client privileges

■ While Kimes was being held in custody, the black duffel bag she had deposited at the Plaza Hotel on the day of Silverman's disappearance remained in the hotel. After her arrest, Kimes asked Lawrence Frost, the private investigator hired to work on her defense team, to retrieve the bag and bring it to her attorney. The bag contained personal items belonging to Kimes, including a loaded gun and several notebooks containing to-do lists which in the words of the People provided a "virtual roadmap to the commission of the offenses charged."

After Frost retrieved the bag, the director of security at the Plaza Hotel notified the detectives investigating Kimes and her son. The People issued subpoenas directed at Kimes's attorneys and her investigator compelling production of the bag. Frost was also subpoenaed to testify before the grand jury.

Kimes moved to suppress the notebooks found within the bag, arguing that the subpoenas violated her Fifth Amendment privilege against self-incrimination and her attorney-client privilege. The court rejected the motion stating that the "circumstances . . . point to the conclusion that [defendants] intended that the bag, which contained items which were exceedingly inculpatory, never surface again."

On appeal, Kimes describes the notebooks as "key" evidence which she asserts was improperly admitted as evidence at trial. We disagree.

The Fifth Amendment to the United States Constitution provides that no defendant in a criminal case "shall be compelled . . . to be a witness against himself." Moreover, it is well settled that the act of producing incriminating documents in response to a subpoena, and responses to questions regarding such production may have a compelled testimonial aspect to which the Fifth Amendment privilege applies. (*United States v Hubbell*, 530 US 27, 36 [2000] [by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic]; *see also In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F3d 87, 93 [2d Cir 1993].)

In *In re Grand Jury*, the court held that the Fifth Amendment privilege extends to the production of documents when the existence and location of the subpoenaed papers are un-

known to the government at the time the subpoenas are issued, or where production would implicitly authenticate the documents. (*Id.*)

Kimes correctly claims that, at the time the police issued the subpoena for the black duffel bag they did not know the contents of the bag, and therefore did not know that the documents existed. Kimes also alleges that the act of production "implicitly authenticated" the notebooks because it was she who checked the bag at the Plaza and the notebooks were in the bag at the time.

Nevertheless Kimes's argument is without merit. First, where the existence, possession and control of the documents are "foregone conclusion[s]," compelled production of the documents does not violate the Fifth Amendment. (*Id.*, quoting *Fisher v United States*, 425 US 391, 411 [1976].) In this case, the police were aware of the existence of the bag through a handwritten reference to the "Plaza" and a claim check number. Police also learned from the head of security at the Plaza Hotel that the bag did in fact exist and had been picked up by private investigator Frost. Therefore, the possession of the bag and its contents including the notebooks was a "foregone conclusion."

In any event, the subpoenas in the case relied on by Kimes were directed at the underlying defendants themselves. In the case at bar, it was Kimes's attorneys and investigator who were subpoenaed to produce the bag. In *Fisher*, the Supreme Court made it clear that a subpoena directed against a defendant's agents does not implicate the Fifth Amendment because the compulsion is directed against the agent, not the defendant, and the agent does not incriminate himself by complying with the subpoena. (425 US at 397-399.)

Kimes further asserts that her attorney-client privilege was violated when her attorneys and private investigator were compelled to produce the notebooks. Relying on *Matter of Vanderbilt (Rosner—Hickey)* (57 NY2d 66 [1982]), she argues that the notebooks were not discoverable in her hands, therefore they were not discoverable in her attorney's hands because they were being delivered to her attorney in contemplation of the pending litigation.

Unlike the defendant in *Vanderbilt*, however, here Kimes has failed to establish that the notebooks were not discoverable in her hands. Kimes voluntarily wrote the notebooks before the subpoena was issued to her lawyers. Therefore, the notebooks could not be said to "contain compelled testimonial evidence."

(*Hubbell, supra* at 36; *see also People v Slavin*, 1 NY3d 392, 399 [2004], *cert denied* 543 US 818 [2004].)

Further, Kimes did not meet her burden of establishing that the notebooks were delivered to her attorney for legal advice. The notebooks were not created by her after the crime as a means of communicating confidential information about the case to her attorneys, as were the tapes in *Vanderbilt*. (*See* 57 NY2d at 76.) Rather, they were created during the planning stages of the crime and contained information regarding Silverman, her townhouse and her staff; all of which had been collected to assist in the commission of the crimes.

The evidence in this case overwhelmingly demonstrates that Kimes arranged for delivery of the bag to her attorney not to obtain legal advice regarding the notebooks but rather to conceal the bag and its contents, hoping they would never surface again. The attorney-client privilege is not properly relied upon where, as here, an attorney is simply utilized by the client "as a repository for any incriminating evidence that might be held by the client." (*Vanderbilt*, 57 NY2d at 80.)

9. Kimes's ineffective counsel claim did not require inquiry and is without merit

 Frost, the private investigator who retrieved Kimes's black duffel bag from the Plaza, was called as a witness at trial for the People. He testified that he attended a meeting with Kimes and her counsel at which Kimes directed him to retrieve the bag and deliver it to her defense attorneys. Frost further testified that he retrieved the bag, took it to his brother's office and privately inspected the bag and its contents. He told the jury he had found a deed bearing the signature of Silverman, notebooks, handcuffs and a loaded pistol. Frost denied putting anything inside the bag or destroying anything within the bag. Frost was then cross-examined by attorneys for both Kimes and her son.

On appeal, Kimes claims that she was denied effective assistance of counsel because Frost's testimony about his retrieval of the bag created a conflict of interest for her defense attorney. Specifically, she asserts that Frost, a member of the defense team, was a key prosecution witness testifying as to the validity and chain of custody of the prosecution's most devastating evidence against the defendant. Kimes argues that defense counsel could not effectively challenge Frost's testimony because to attack Frost would be to attack a member of the defense team, and thus, defense counsel's own credibility. We find Kimes's claims of ineffective assistance of counsel unavailing.

A defendant has a federal and New York State constitutional right to effective assistance of counsel. This right entitles a defendant to representation that is "reasonably competent, conflict-free and singlemindedly devoted to the client's best interests." (*People v Longtin*, 92 NY2d 640, 644 [1998], *cert denied* 526 US 1114 [1999].) But, a defendant's rights are not violated if the prosecution calls a defendant's expert as a witness. (*People v Greene*, 153 AD2d 439, 448 [2d Dept 1990], *lv denied* 76 NY2d 735 [1990], *cert denied* 498 US 947 [1990].)

Kimes contends, however, that testimony by a defendant's investigator is different from testimony by a defendant's expert witness. Relying on two cases where attorneys testified against their clients, *People v Lewis* (2 NY3d 224 [2004]) and *People v Berroa* (99 NY2d 134 [2002]), she argues that Frost was an agent of her attorneys.

However, there is no evidence that Frost was part of the "defense team" during the trial. Frost was hired to do preliminary investigative work for the defense. Nowhere does the record indicate that Frost worked beyond the initial stages of the case. Because Frost was not part of the "defense team" at the time of trial, we find that an attack on his credibility would not have had any effect on the defense attorney's credibility.

We have also considered Kimes's claim that her conviction should be reversed because the trial court did not alert her to the alleged conflict of interest and find that it is equally unavailing.

10. Minor restrictions on cross-examination did not violate Kimes's right to confront the witnesses against her

On appeal, Kimes claims the trial court restricted her cross-examination of two of the People's witnesses, thus violating her Sixth Amendment right under the Confrontation Clause. John Osborn was the People's handwriting expert; Alex Genova was a former convict who met the Kimeses on their first day in New York, and whom the defendant subsequently contacted for help in her search for a notary.

Several weeks before Genova testified at the trial of Kimes and her son, he pleaded guilty in federal court to possession of a controlled substance with intent to sell. Although he was facing a possible 40-year sentence, he received three years' probation because he agreed to cooperate in an investigation of the drug trade in Brooklyn. However, it was established that Genova had not been promised any benefit for his testimony at Kimes's trial. The court allowed Kimes to inquire into the underlying

facts of Genova's convictions, whether Genova had cooperated with federal authorities against his codefendant and whether Genova had received any benefit on his federal case as a result of testifying against Kimes. Defense counsel cross-examined Genova extensively about these topics. Defense counsel also attempted to cross-examine Genova about his "propensity to work with the government in order to turn other people in." The court ruled that it would be "extraneous and irrelevant" for the defense to delve into details of Genova's "cooperation agreement" with the federal authorities and inappropriate to suggest that Genova was a professional cooperator.

John Osborn testified for the People as an expert in forensic document examination. During his testimony he rendered opinions as to the authenticity of purported Silverman signatures on documents found among the defendant's property, and concluded that several of them were fake. Kimes wanted to cross-examine Osborn about alleged mistakes in high-profile cases made by his grandfather and father both of whom trained Osborn.[4] The court ruled that opinions made by the father and grandfather in past cases were "irrelevant" and further that Osborn had not claimed that they were infallible.

On appeal, Kimes asserts that these restrictions violated her constitutional right of confrontation. She argues that both men were significant witnesses and that she was prevented from fully challenging their credibility and reliability. We disagree.

" '[T]he Confrontation Clause guarantees an *opportunity* for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v Van Arsdall*, 475 US 673, 679 [1986], quoting *Delaware v Fensterer*, 474 US 15, 20 [1985].) Further, trial judges are given wide latitude to impose reasonable limits on cross-examination. (*Id.*)

In this case, the issues upon which restrictions were placed were peripheral to the case. Moreover, even if Kimes's right to cross-examine was violated, Confrontation Clause errors are subject to harmless error analysis. (*Van Arsdall*, 475 US at 681-682, 684.) Here, cross-examination on the topics would not have appreciably undermined the People's case. Genova was not the only witness as to Kimes's attempt to procure a notary; and Os-

---

4. Allegedly, his grandfather had erred in identifying the author of the ransom note in the Lindbergh kidnapping; his father had made an error in verifying the Howard Hughes autobiography.

born, while the only handwriting expert called by the People, was not the only witness to render opinions on Silverman's signature or Kimes's handwriting.

11. Kimes's right to counsel was not violated by a one-night telephone ban

██ One month into the trial, the court notified defense counsel that Kimes had called a reporter at The New York Times to refute the testimony at trial. The court warned, "if she persists, I will just cut out the phone calls completely."

On May 4, 2000, the People noted that despite the court's ruling prohibiting Kimes from contacting the press, and despite her counsel's wishes, Kimes had again contacted The New York Times. The court then cut off her phone privileges. Defense counsel joined in the application, agreeing that his client should not be allowed to talk to the press. However, counsel asked the court to modify the ban on Kimes's telephone privileges to allow her to contact her attorneys. The court, expressing doubt as to effective supervision by the Department of Correction, denied counsel's request. The court noted that Kimes knew of the order and the consequences of violating the order, therefore she had consciously forfeited her phone privileges. The next day, however, her telephone privileges were restored with respect to her attorneys.

On appeal, Kimes argues that she was denied her right to effective counsel when she was denied phone privileges overnight. Citing *Geders v United States* (425 US 80 [1976]) and *People v Joseph* (84 NY2d 995 [1994]), Kimes claims that the overnight ban on her telephone privileges violated her state and federal constitutional right to effective counsel. We disagree.

Both *Geders* and *Joseph* involved an outright ban on *consulting* with counsel. However, in the case at bar, taking away Kimes's telephone privileges did not constitute a prohibition against consulting with counsel, or make it impossible for her to consult with counsel.

12. Kimes's right to be present was not violated by her absence when attorney questioned her mental competency

██ At a bench conference held in Kimes's absence, her attorney informed the trial court that he believed Kimes should not testify because he felt she was mentally incompetent and becoming "irrational and delusional." The attorney requested a CPL 730.30 competency hearing. The court refused, stating that there was no basis for such hearing because Kimes was

"clearly competent aware and attentive." The court then informed Kimes's attorney who attempted to argue further: "You have to put that on the record so [defendant] hears it." The issue of Kimes's competency was not pursued again, and Kimes did not testify.

On appeal, Kimes asserts that the exclusion violated her rights to be present at trial. She further asserts that her absence from this brief exchange between the judge and her defense attorney was tantamount to her exclusion from a critical moment in the proceedings that "involved factual matters about which [she] might have peculiar knowledge." We disagree.

As a general matter, a defendant has a constitutional and statutory right to be present at all material stages of the trial. (*People v Williams*, 85 NY2d 945 [1995]; *see* CPL 260.20.) Moreover, a defendant has a right to be present at ancillary proceedings when he/she may have " 'something valuable to contribute.' " (*People v Williams*, 85 NY2d at 947, quoting *People v Morales*, 80 NY2d 450, 456 [1992].) However, a defendant does not necessarily have a right to be present at a CPL 730.30 proceeding that does not entail a hearing or any significant factual inquiry. (*See People v Horan*, 290 AD2d 880 [3d Dept 2002], *lv denied* 98 NY2d 638 [2002]; *People v Racks*, 221 AD2d 664 [2d Dept 1995], *lv denied* 88 NY2d 992 [1996]; *People v Slejska*, 197 AD2d 420 [1st Dept 1993], *lv denied* 82 NY2d 903 [1993].) Therefore, we find that Kimes's absence at the bench conference did not violate either her constitutional or statutory right to be present.

13. The trial court did not overlook a *Brady* violation

Kimes contends that the trial court should have conducted an inquiry into a possible *Brady* violation on the grounds that a police report into the Silverman investigation contained a reference to latent prints that were identified as prints of one Shawn Little, described as a suspect. Kimes's allegation that the report was withheld from her and that therefore the People failed to comply with their ongoing *Rosario* obligations in providing her with exculpatory material is without merit.

Kimes failed to preserve the issue for appellate review. In any case, Kimes was, in fact, provided with the police report before trial. Indeed, Kimes's knowledge of the report and fingerprint match was evident in her cross-examination of the detective who conducted that investigation.

Accordingly, the judgment of the Supreme Court, New York County (Herbert I. Altman, J., at pretrial motions; Rena K.

Uviller, J., at pretrial motions, jury trial and sentence), rendered June 27, 2000, convicting Sante Kimes of murder in the second degree (three counts), robbery in the first degree, burglary in the first degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree (two counts), criminal possession of stolen property in the third degree, forgery in the second degree (16 counts), criminal possession of a forged instrument in the second degree, eavesdropping (29 counts), conspiracy in the fourth degree, and attempted grand larceny in the first degree, and sentencing her to an aggregate term of 120 years to life, should be affirmed.

Motion denied.

TOM, J.P., MARLOW, GONZALEZ and MALONE, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 27, 2000, affirmed. Motion denied.