Matter of Kosmo Family Trust (2024 NY Slip Op 24324)

[*1]

Matter of Kosmo Family Trust

2024 NY Slip Op 24324

Decided on December 23, 2024

Surrogate's Court, Albany County

Pettit, S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 23, 2024
Surrogate's Court, Albany County

In the Matter of the Kosmo Family Trust. 
 Laura E. Knipe Wieland et al., Petitioners, Donna Savino, Respondent.

File No. 2018-235/A

Richard D. Cirincione, Attorney for Petitioners, Whiteman Osterman & Hanna, LLP, Albany
William F. Ryan, Jr., Attorney for Respondent, Tabner, Ryan & Keniry, LLP, Albany

Stacy L. Pettit, S.

Janet D. Kosmo (hereinafter decedent) died a resident of California on December 10, 2017,[FN1]
survived by two adult children, Laura E. Knipe Wieland (hereinafter Laura) and Richard X. Knipe (hereinafter Richard). Her daughter Claudia Knipe (hereinafter Claudia) predeceased her in 2006, and her husband Joseph R. Kosmo (hereinafter Kosmo) predeceased her in January 2013. She was also survived by two adult grandsons, petitioner Brent Knipe (hereinafter Brent) and petitioner Steven X. Knipe (hereinafter Steven), the sons of Richard. Decedent's daughter Claudia, who was developmentally disabled, resided in a group home in Albany County prior to her death. Respondent Donna Savino was employed for a time as a health care worker in Claudia's group home, which is how respondent became acquainted with decedent.
In 1994, decedent and Kosmo created the Kosmo Family Trust, naming themselves as the trustees of the trust upon its creation. Under the 1994 trust, after the death of Kosmo and decedent, the trust was to be split in two shares and decedent's share was to be distributed in general bequests to Steven, Brent, Claudia, and decedent's brother Robert E. Wendel, with the remainder to Laura. In 2008, decedent and Kosmo executed the Amendment and Restatement of the Kosmo Family Trust dated August 25, 2008, under the supervision of attorney Debra Halvarson Groh. Pursuant to the terms of the 2008 trust, after the death of Kosmo and decedent, decedent's one-half share would be distributed 90% to Richard and 10% to decedent's nephew, [*2]Charles Wendel.[FN2]
The successor co-trustees named were Kosmo's brother, William Kosmo, and decedent's son Richard.
Following Kosmo's death, his one-half share of the trust became irrevocable and his beneficiaries and trustees could not be changed, but decedent amended the terms of her one-half share of the trust, designated as the "survivor's share," three times in three years, each time changing the beneficiaries and trustees.[FN3]
Pursuant to the first amendment, executed on July 23, 2013, the residue of decedent's share of the trust was left equally to decedent's grandsons, Brent and Steven, after a $25,000 gift to respondent and a $25,000 gift to decedent's friends, Jens Gramer and Sybille Gramer. The first amendment named Steven as the successor trustee to decedent, and Brent as the alternate trustee of decedent's share. The second amendment, executed March 9, 2015, retained the cash gift of $25,000 to decedent's friends the Gramers, and left the remainder of decedent's share to respondent. The second amendment named respondent as the successor trustee to decedent, and Jens Gramer and Sybille Gramer as alternate trustees. Finally, the third amendment, executed July 25, 2016, removed the bequest to the Gramers, and left decedent's entire share of the trust to respondent. At the time of the execution of the third amendment, respondent was added as a co-trustee and she executed the third amendment along with decedent. Groh drafted all three amendments and supervised their execution. The trust contains a choice of law provision, which provides that California law shall apply to the validity of the trust and the construction of its beneficial provisions, regardless of any change in the residence of the trustee.
Following decedent's December 2017 death, respondent engaged the services of Groh, and on January 9, 2018, respondent issued a notification by trustee to decedent's heirs under California Probate Code § 16061.7, which named her as trustee, and Groh as her counsel.[FN4]

In March 2018, Laura commenced a proceeding to invalidate the first, second and third amendments to the 2008 trust alleging, among other things, that respondent exercised undue [*3]influence over decedent which resulted in decedent executing the amendments to the 2008 trust, ultimately removing her family and friends as beneficiaries and leaving the entirety of the trust assets to respondent.[FN5]
 Respondent answered the petition, raising several affirmative defenses including inconvenient forum, and contemporaneously moved to dismiss the petition pursuant to CPLR 327. By decision and order of this Court dated May 29, 2018, respondent's motion to dismiss for inconvenient forum was denied.
Respondent later moved for summary judgment dismissing the petition, arguing, among other things, that Laura lacked standing to commence the proceeding because she was not a beneficiary of the 2008 trust and therefore would not benefit by voiding the first, second and third amendments to the trust. In response, on July 16, 2018, Richard executed an assignment of 50% of his interest in the 2008 trust to Laura, who then opposed respondent's motion, arguing that the recent assignment of interest gave her standing to bring the petition. In December 2018, this Court issued a decision and order granting respondent's motion to dismiss, without prejudice, finding that petitioner lacked standing at the time she commenced the proceeding (see Matter of Kosmo Family Trust, 61 Misc 3d 1224[A] [Sur Ct, Albany County 2018], appeal dismissed 176 AD3d 1465 [3d Dept 2019]). In dicta, this Court further found that the New York statute of limitations applied and that the time to re-commence a proceeding had not passed. On respondent's appeal, the Appellate Division, Third Department, dismissed the appeal by decision and order entered October 24, 2019, on the ground that respondent was not aggrieved by this Court's decision granting her motion to dismiss without prejudice, as "dismissal without prejudice was required by law because the decision was not made on the merits" (Matter of Kosmo Family Trust [Wieland—Savino], 176 AD3d 1465, 1467 [3d Dept 2019]). The Appellate Division also noted that this Court's discussion of the statute of limitations issue was dicta and, therefore, did not provide a basis upon which to take an appeal.
In December 2018, the instant proceeding was commenced to invalidate the first, second and third amendments. This proceeding was commenced by Laura, Richard, Brent and Steven as petitioners, and sought an order determining that the first amendment, the second amendment and the third amendment to the trust are void due to the lack of the required mental capacity of decedent at the time of execution of the documents, or due to undue influence and misrepresentation by respondent. Respondent answered the petition and raised affirmative defenses including inconvenient forum, statute of limitations, lack of standing and capacity, failure to state a cause of action, and noncompliance with California Probate Code § 16061.8.
In April 2021, respondent moved for an order granting summary judgment dismissing the petition, arguing that petitioners' claims of lack of capacity and undue influence were baseless, and that the claims brought by Richard and by Laura as his assignee were time-barred. Petitioners opposed the motion for summary judgment; however, they deliberately abandoned their argument that the first amendment should be voided. In July 2021, the Court issued a decision and order granting respondent's motion for summary judgment in part by: (1) dismissing the claims of Laura and Richard due to the withdrawal of their objections to the validity of the first amendment to the trust and their resulting lack of standing; and (2) [*4]dismissing those claims of Brent and Steven that sought to void the trust amendments based on lack of mental capacity. The Court denied respondent's motion to dismiss the petition as to the claims of Brent and Steven in all other respects, finding that there were questions of fact that precluded summary judgment dismissing the undue influence and fraud claims, including whether a confidential relationship existed between decedent and respondent (see Matter of Kosmo Family Trust, 72 Misc 3d 1214[A] [Sur Ct, Albany County 2021], affd 207 AD3d 934 [3d Dept 2022]). Respondent appealed the Court's July 2021 decision and order to the Appellate Division, Third Department. On appeal, the Appellate Division affirmed this Court's decision (see Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d 934 [3d Dept 2022]).
In June 2024, a bench trial was held before this Court over two days. Petitioners presented as witnesses Laura, Sybille Gramer, Brent, Annette Knipe (hereinafter Annette), Janice Myers, Steven, Nancy Barrera, respondent, and Max Wachtel. Respondent read an excerpt from the deposition of Richard, and also included as a trial exhibit the deposition testimony of Groh, both pursuant to CPLR 3117. Following the trial, the parties engaged in settlement discussions which were ultimately unsuccessful. As a result, the parties filed their posttrial briefs with this Court and submitted the matter for decision. The substantive claims remaining before the Court are: (1) whether the July 2016 third amendment to the trust should be voided due to the exercise of undue influence by respondent over decedent; and (2) whether the March 2015 second amendment to the trust should be voided due to the exercise of undue influence by respondent over decedent.[FN6]

Initially, since the trust document contains a choice of law provision designating California law as governing, "the substantive law of California is applicable to '[a]ll questions concerning the validity, interpretation, and administration of [the trust]'" (Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936, quoting Tanges v Heidelberg N. Am., 93 NY2d 48, 53 [1999]; see Matter of Frankel v Citicorp Ins. Servs., Inc., 80 AD3d 280, 285 [2d Dept 2010]). "Traditionally, procedural and evidentiary issues are governed by the law of the forum" (People v Benson, 88 AD2d 229, 231 [3d Dept 1982]; see Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936; Askari v McDermott, Will & Emery, LLP, 179 AD3d 127, 153 [2d Dept 2019]; see generally Restatement, Conflict of Laws 2d, §§ 122, 138).
Preliminarily, the Court must address some evidentiary concerns raised by the parties. First, respondent argues that this Court must not consider testimony that is barred by CPLR 4519—commonly known as the Dead Man's Statute—which renders incompetent a witness who is interested in the event to testify at trial regarding personal transactions or communications with a deceased person against certain protected persons. Respondent raised several objections at trial to testimony she asserted was inadmissible under CPLR 4519. Petitioner countered that the Dead Man's Statute does not apply to trusts, based on Matter of Myers (45 AD3d 955 [3d Dept 2007]).
The purpose of CPLR 4519 is "to prevent the living from testifying to certain 'personal transactions' with the dead. One of the main purposes of the rule was to protect the estate of the [*5]deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court" (Matter of Wood, 52 NY2d 139, 143—144 [1981]; accord Matter of Zalk, 10 NY3d 669, 678 [2008]).
While recognizing that "this Court is bound to follow precedent from the Third Department" (New York State Thruway Auth. v Fenech, 29 Misc 3d 644, 649 [Sup Ct, Albany County 2010], revd 94 AD3d 17 [3d Dept 2012]; see Matter of Patrick BB., 284 AD2d 636, 639 [3d Dept 2001]; Mountain View Coach Lines v Storms, 102 AD2d 663, 664 [2d Dept 1984]), the Court is not persuaded that CPLR 4519 is inapplicable to this proceeding under Matter of Myers (45 AD3d 955 [3d Dept 2007]). Arguably, the cited language in Myers, that the Dead Man's Statute was inapplicable because that proceeding was "a trust proceeding" is dicta. Before reaching that conclusion, the Appellate Division first noted that the statement in lieu of transcript supplied by the trial court did not establish that the petitioner's testimony was taken in violation of the statute. The Court next stated that respondent did not preserve the issue by making an appropriate objection before the trial court. Finally, the Court stated, "'[i]n any event, even assuming a proper objection," the statute did not apply to the proceeding at hand. Inasmuch as the Court first found that there was no such testimony and that the argument was not preserved, the subsequent language regarding the type of proceeding was "not necessary to resolve the matter'" (RT 13 Rocks LLC v Town of Cortlandville, 229 AD3d 1018, 1020 [3d Dept 2024], quoting Matter of Doe v Rensselaer Polytechnic Inst., 172 AD3d 1691, 1692-1693 [3d Dept 2019]).
Even if the cited language in Myers is not dicta, this Court does not find that it results in an across-the-board determination that trust proceedings are not subject to CPLR 4519. In Myers, the dispute was between two living parties regarding one party's desire to have a parcel of real property held by the other party in an inter vivos trust transferred to him directly. No interest of a decedent was involved in the transaction and, as the Court noted, it was "not a dispute concerning the proper disposition of a decedent's estate" (Matter of Myers, 45 AD3d at 957). In contrast, the proceeding presently before this Court does involve the proper disposition of a decedent's estate, albeit through a trust as opposed to a will. While CPLR 4519 specifically names administrators and executors as protected persons, without explicitly including trustees, it also includes as protected persons "a person deriving his [or her] title or interest from, through or under a deceased person," which would include respondent, as the trustee and sole beneficiary under the third amendment to the trust (see Brundige v Bradley, 294 NY 345, 349-350 [1945]). Accordingly, the Court finds that CPLR 4519 applies to this proceeding.
With respect to which witnesses the Dead Man's Statute applies to in this proceeding, "[t]he test of the interest of a witness is whether the witness will gain or lose by the direct legal operation and effect of the judgment or that the record will be legal evidence for or against the witness in some other action" (Smith v Kuhn, 221 AD2d 620, 621 [2d Dept 1995]; see Laka v Krystek, 261 NY 126, 130 [1933]). Here, petitioners seek to invalidate the third amendment to the trust and the second amendment to the trust. Accordingly, the testifying witnesses who would gain or lose by the judgment in this matter are Brent, Steven, and Sybille Gramer.
As to what testimony is precluded, the statute prohibits testimony "concerning a personal transaction or communication between the witness and the deceased person" (CPLR 4519). This language has been broadly interpreted to "embrace every variety of affairs which can form the subject of negotiation, interviews, or actions between two persons, and include every method by which one person can derive impressions or information from the conduct, condition, or [*6]language of another" (Holcomb v Holcomb, 95 NY 316, 325 [1884]).
Accordingly, the Court shall disregard all testimony by the interested witnesses—Brent, Steven, and Sybille Gramer—regarding decedent. It is noted that CPLR 4519 does not "preclude testimony of transactions between decedent and a non-interested third party" (Matter of Nealon, 104 AD3d 1088, 1090 [3d Dept 2013], affd 22 NY3d 1045 [2014]). "Further, the statute's protections with regard to a particular transaction may be waived where the representative 'testifies in his [or her] own behalf concerning a personal transaction of his [or her] adversary with the deceased' or when he or she 'elicit[s] testimony from an interested party on the personal transaction in issue'" (Matter of Nealon, 104 AD3d at 1090, quoting Matter of Wood, 52 NY2d at 145; see Matter of Breistol, 64 AD3d 1122, 1123-1124 [3d Dept 2009]).
Respondent also argues that this Court cannot consider any testimony elicited at trial that constitutes hearsay. At trial, petitioners asserted that the objected-to testimony was admissible under the state of mind exception to the hearsay rule.
It is well settled that evidence is hearsay where it is " 'a statement made out of court, that is, not made in the course of the trial [and] is offered for the truth of the fact asserted in the statement' " (People v Romero, 78 NY2d 355, 361 [1991], quoting Richardson, Evidence § 200, at 176 [Prince 10th ed]). Hearsay statements are inadmissible "unless they satisfy one of the exceptions to the hearsay rule" (Kaufman v Quickway, Inc., 64 AD3d 978, 980 [3d Dept 2009], affd 14 NY3d 907 [2010]). One such exception applies to statements that show the state of mind of the declarant (see People v Kimes, 37 AD3d 1, 18-19 [1st Dept 2006]; Grossjahann v Wilkins & Sons, 244 AD2d 808, 810 [3d Dept 1997]; Tomanelli v Lizda Realty, 174 AD2d 889, 890 [3d Dept 1991]; Veras v Truth Verification Corp., 87 AD2d 381, 386 [1st Dept 1982], affd 57 NY2d 947 [1982]; Matter of Brian W., 48 AD2d 660, 661 [2nd Dept 1975]). "Under the 'state of mind' hearsay exception, 'when a particular act of [a] declarant is at issue, the declarant's statement of a future intent to perform that act is admissible as proof of the declarant's intent on that issue and as inferential proof that the declarant carried out his intent" (People v D'Arton, 289 AD2d 711, 712-713 [3d Dept 2001], lv denied 97 NY2d 728 [2002], quoting People v Chambers, 125 AD2d 88, 91 [1st Dept 1987], appeal dismissed 70 NY2d 694 [1987]; see Mutual Life Ins. Co. v Hillmon, 145 US 285, 295—296 [1892]; People v Toland, 284 AD2d 798, 805 [3d Dept 2001], lv denied 96 NY2d 942 [2001]).
Here the Court finds that the objected-to statements testified to by disinterested witnesses were admissible to show state of mind rather than the truth of the statements. To the extent any such objections were sustained at trial, the Court has not considered those statements in making its decision.
Respondent also contends that the opinion of petitioners' expert, Max Wachtel, should be given little to no weight. Specifically, respondent argues that Wachtel failed to use his own screening tool, and formed his opinions, as set forth in his trial testimony and his written report, based on inadmissible hearsay.
"A[n expert's] opinion may be received in evidence even though some of the information on which it is based is inadmissible hearsay, if the hearsay is 'of a kind accepted in the profession as reliable in forming a professional opinion, or if it comes from a witness subject to full cross-examination on . . . trial'" (Matter of Chi-Chuan Wang, 162 AD3d 447, 449 [1st Dept 2018], lv denied 32 NY3d 904 [2018], quoting People v Goldstein, 6 NY3d 119, 124 [2005], cert denied 547 US 1159 [2006]; see People v Jones, 73 NY2d 427, 430 [1989]). While the Court appreciated Wachtel's testimony with respect to his explanation of undue influence under [*7]California law, the Court finds that it is able to reach a determination on the issues before it based on the other testimony and documentation that was admitted into evidence and, therefore, disregards Wachtel's testimony.
Turning to the substantive issues at hand, under California common law, "undue influence, in the context of a testamentary disposition of property by will or trust, [is defined] as 'pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency'" (Lintz v Lintz, 222 Cal App 4th 1346, 1354 [2014], quoting Rice v Clark, 28 Cal 4th 89, 96 [2002]; see Hagen v Hickenbottom, 41 Cal App 4th 168, 182 [1995] [applying testamentary principles of undue influence to estate plans executed by inter vivos trust and pour-over will]). California has supplemented the common law definition with a statute, which states that undue influence is "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity" (Cal Welf & Inst Code § 15610.70 [a]; see Cal Prob Code § 86). "Influence which reaches the stage of being undue influence is not at all the same in every case. In one case it takes but little to unduly influence a person; in another case much more. Accordingly, every case must be viewed in its own particular setting" (Estate of Sarabia, 221 Cal App 3d 599, 607 [1990] [internal quotation marks, brackets, ellipsis and citations omitted]; accord Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936-937). "Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances'" (Lintz v Lintz, 222 Cal App 4th at 1355, quoting Estate of Hannam, 106 Cal App 2d 782, 786 [1951]).
"Normally, the party contesting a testamentary disposition bears the burden of proving undue influence" (Conservatorship of Davidson, 113 Cal App 4th 1035, 1059 [2003] [citation omitted], overruled in part on other grounds Bernard v Foley, 39 Cal 4th 794, 816 n 14 [2006]; see Rice v Clark, 28 Cal 4th at 97). "In certain narrow circumstances, a challenger to a trust instrument may invoke 'a presumption of undue influence' by demonstrating that '(1) [the respondent] . . . had a confidential relationship with the [decedent]; (2) [the respondent] actively participated in procuring the instrument's preparation or execution; and (3) [the respondent] would benefit unduly by the testamentary instrument'" (Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936-937, quoting Rice v Clark, 28 Cal 4th at 96-97; see Estate of Garibaldi, 57 Cal 2d 108, 113 [1961]; Keading v Keading, 60 Cal App 5th 1115, 1127 [2021]; Estate of Auen, 30 Cal App 4th 300, 309 [1994]; Estate of Sarabia, 221 Cal App 3d at 605).
Without a presumption of undue influence, the party contesting the testamentary disposition "may establish undue influence by submitting either direct or circumstantial proof establishing, among other things, that '(1) [t]he provisions of the [trust] were unnatural[;] (2) the dispositions of the [trust] were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his [or her] freedom of will;' and (5) whether 'the person charged with undue influence was in fact active in procuring the execution of the instrument in question'" (Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936-937, quoting Estate of Ventura, 217 Cal App 2d 50, 59—60 [1963] [internal quotation marks, ellipsis and citations omitted]; see Estate of Franco, 50 Cal App 3d 374, 382—383 [1975]).
Turning first to the issue of whether petitioners may invoke a presumption of undue influence, they would need to demonstrate: (1) that respondent had a confidential relationship with decedent; (2) that respondent actively participated in procuring the preparation or execution of trust amendments two and three; and (3) that respondent would benefit unduly by trust amendments two and three. With respect to the first factor, under California law, "[i]t is well settled that '[a] confidential relationship exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind; it may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship'" (Estate of Sanders, 40 Cal 3d 607, 615 [1985], quoting Kudokas v Balkus, 26 Cal App 3d 744, 750 [1972]; accord Hudson v Foster, 68 Cal App 5th 640, 662-63 [2021]).
"The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party" (Barbara A. v John G., 145 Cal App 3d 369, 383 [1983]; accord Richelle L. v R.C. Archbishop, 106 Cal App 4th 257, 271 [2003], as mod [Mar. 17, 2003]). "[T]he essential elements [of a confidential relationship are]: '1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself.'" (Richelle L. v R.C. Archbishop, 106 Cal App 4th at 272, quoting Langford v R.C. Diocese of Brooklyn, 177 Misc 2d 897, 900 [Sup Ct, Kings County 1998], affd 271 AD2d 494 [2d Dept 2000]). "Vulnerability is a necessary and essential predicate of a confidential relationship" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], as mod on denial of reh [Nov. 12, 2024], review filed [Nov. 26, 2024]; see Richelle L. v R.C. Archbishop, 106 Cal App 4th at 273). "Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability" (Cal Welf & Inst Code § 15610.70 [a] [1]; see Hamlin v Jendayi, 105 Cal App 5th 1064 [2024]; Keading v Keading, 60 Cal App 5th at 1126). "[T]he existence of a confidential relationship is a question of fact" (Richelle L. v R.C. Archbishop, 106 Cal App 4th at 272 n 6; see Hamlin v Jendayi, 105 Cal App 5th 1064 [2024]).
The overwhelming evidence supports a finding that decedent and respondent were in a confidential relationship. First, with respect to the third amendment, respondent was already named as decedent's agent under the power of attorney and as the health care proxy under decedent's advance health care directive at the time decedent signed the third amendment, which indicates that respondent had a fiduciary relationship with decedent and, by virtue of being chosen for those roles, establishes that decedent had trust and confidence in respondent to make decisions for her (see Hamlin v Jendayi, 105 Cal App 5th 1064 [2024] ["Courts have consistently found a confidential relationship when the beneficiary . . . has the power of attorney prior to the time a will or other testamentary document was executed"]). Decedent's testamentary plans also directed that her cremated remains, along with those of her husband and her daughter Claudia be distributed to respondent. In addition, respondent was privy to decedent's confidential estate and lifetime planning with her attorney, as demonstrated by her inclusion, waiving decedent's attorney-client privilege with respect to respondent, in the retainer agreements signed by decedent prior to the execution of the second and third amendments. She was also named as co-trustee of the trust under the third amendment. Furthermore, decedent's attorney characterized [*8]respondent as decedent's "trusted friend" in these documents, and the trust amendments expressly describe respondent as decedent's "good" and "trusted friend," which supports the inference of a confidential relationship.
Additional evidence establishes that respondent had gained decedent's confidence and purported to act or advise decedent with respondent's interests in mind throughout their relationship. Decedent was 83 when she died in 2017. Respondent was 68 at the time of trial in 2024, which indicates she was approximately 22 years younger than decedent, and likely around the same age as decedent's disabled daughter Claudia, who had celebrated her 50th birthday sometime prior to her death in 2006. The evidence showed that decedent was emotionally vulnerable at the outset of her relationship with respondent and remained that way over the years. Respondent's own testimony established that she befriended decedent through her position as a caretaker for Claudia. Respondent testified that she spoke with decedent on the phone because decedent called Claudia at the residence every day. She also testified that decedent called more than the parents of other residents at the home. When Claudia became ill toward the end of her life, Laura testified that respondent came to the hospital repeatedly and was in Claudia's room with decedent, who had traveled to New York from California for Claudia's illness, when Laura called the hospital. Laura testified that, while decedent was in New York to visit Claudia in the hospital, she went out to dinner with respondent. Respondent maintained a relationship with decedent even after Claudia passed away, which coincided with decedent having a significant falling out with Laura in relation to Claudia's end of life, and Laura ultimately remained estranged from decedent for the rest of decedent's life. Following Claudia's death in 2006, decedent's only sibling died around 2010 or 2011, and then her spouse passed away in January 2013. Decedent, having been estranged from Laura since 2006, also stopped speaking with her son Richard around 2013.
Several witnesses testified that decedent telephoned family and friends excessively, and that she desired attention and would be upset if she felt it was not reciprocated. Laura testified that decedent was calling Richard "quite a few times while he was over in Afghanistan, on base there, and he couldn't talk to her as much as she wanted." Laura testified that during her relationship with decedent, "she would call quite a number of times a day at my work, my home, at my friend's house. And if you didn't talk to her, she would become agitated." In addition, decedent's ex-daughter-in-law Annette testified that she spoke by phone with decedent at least every other day, and respondent testified that decedent would call her two or three times a day. The Court finds there is sufficient evidence that decedent was vulnerable by reason of her age and her loss of close family, and that respondent was fully aware of that vulnerability.
In addition, the Court finds that there was sufficient evidence that decedent empowered respondent, and respondent accepted that empowerment which resulted in decedent being unable to protect herself. Although decedent had lost her spouse and was estranged from her children, there was testimony by Laura and Annette that she maintained good relationships with her grandsons and their families, and had several close friends. Despite this, over the years respondent began to replace those close family and friends, and appeared to become the primary person in decedent's life.
Laura testified that decedent was close friends with Jens Gramer and Sybille Gramer, whom she had been friends with since before her husband passed away; decedent's neighbor Janice Myers; Decedent's ex-daughter-in-law Annette; and Annette's sister Nancy Barrera. Laura testified that Janice Myers had a key to decedent's house and that they had been friends since [*9]decedent moved into the house in the 1960s. Laura testified that the Gramers also had a key to the house. Laura testified that Nancy Barrera would occasionally take decedent to doctors' appointments, and that the Gramers may have as well.
Annette also testified that decedent was close friends with the Gramers but noted that "something happened. They had a falling out or something." She further testified that decedent mentioned, toward the end of her life, a friend—respondent—who was visiting her "about once a year, to help her out." Annette testified that decedent "went on about [respondent] this and [respondent] that and we didn't know who she was" and that decedent told her that respondent "had taken care of Claudia . . . and so she felt a real connection to her."[FN7]
Annette further testified that decedent reported that she named respondent as executor of her will and trustee of her trust because respondent had offered to take care of decedent's pet cat, Pooh. Decedent, who lived alone, indicated to respondent that "this cat [was] her life, this cat [was] everything to [decedent]."[FN8]
Annette testified that decedent said that respondent told her "she would take care of Pooh, and [decedent] liked that," noting that respondent had a cat as well, "so her cat and Pooh can be friends." Annette also testified that decedent told her that respondent had offered to build an extra room on her house in New York for decedent to come and live with her.[FN9]

Janice Myers testified that she had a key to decedent's house for many years and that she would take care of decedent's pet cat when she was away. She also testified that she took decedent to a few appointments, although not close to the time that decedent died. She testified that a couple of years before decedent died, respondent came to Janice Myers' house and said decedent's locks were going to be changed and took the key back from her. Janice Myers testified that she did not get the key back after that.
Respondent testified at trial that she obtained a key to decedent's home in October 2017; however, her deposition testimony was that she had the key for the last two years of decedent's life. When questioned about the discrepancy, respondent stated that she hoped her memory of the events prior to decedent's death would have been better in 2020, when she was deposed, than it was in 2024. She also testified that she telephoned the Gramers, purportedly on decedent's behalf, and told them to return decedent's house key. Accordingly, the evidence suggests that respondent, who lived across the country from decedent, took away decedent's house keys from her next door neighbor and from her close friends years before decedent's death and kept a key for herself. Notably, respondent was not a frequent visitor to California, having only visited decedent there four times between 2006 and 2017.[FN10]

Nancy Barrera testified that she lived about 25 minutes from decedent's home and that she occasionally took decedent to doctors' appointments. She stated that there was never a time when she was unable to take decedent to an appointment, or when decedent did not want Barrera to take her. Despite that, respondent testified that she offered to fly to California to accompany decedent to appointments.
Respondent's own testimony further solidified that she had a confidential relationship with decedent. She testified that, after Claudia died, decedent and respondent would speak numerous times a day by telephone, stating that both decedent would call her and she would call decedent at least once a day. She testified that she visited decedent four times in California and she would stay in decedent's home for those visits. She testified that she went to decedent's attorney's office with decedent and stayed for the entire appointment. When asked if decedent told respondent why she was naming her as a beneficiary of her trust, respondent testified that she told decedent, "because you love me," and decedent responded, "you're absolutely correct." Respondent testified that she had a key to decedent's home, although her trial testimony that she received the key in October 2017 conflicted with her earlier deposition testimony from 2020 that she had the key for the last two years of decedent's life. She testified that decedent never met or spoke with respondent's daughter who was listed as the alternate agent in the power of attorney, after respondent. The Court finds that there is ample evidence establishing that decedent and respondent shared a confidential relationship.
Turning to the second prong of the presumption of undue influence analysis, "[t]he active participation element requires proof of a 'causal link between the ability to influence the testator arising from the confidential relationship and the unnatural document. Mere general influence is not enough. A contestant must show that the influence was brought directly to bear upon the testamentary act'" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], quoting Estate of Fritschi, 60 Cal 2d 367, 374 [1963]).
With respect to the third amendment, respondent's own testimony established that she was present with decedent in Groh's office to discuss the preparation of the third amendment, as well as the power of attorney. This was corroborated by Groh in her deposition testimony. Both parties included in their exhibits an attorney client employment agreement between decedent and Groh, signed April 18, 2016 (three months prior to the execution of the third amendment) which states that decedent waived her confidential attorney-client privilege for respondent. In addition, testimonial and documentary evidence established that Groh sent the draft third amendment to decedent with a note asking her to review and confirm that Groh could mail a copy to respondent. Significantly, respondent was named as a co-trustee pursuant to the third amendment and she personally executed the third amendment along with decedent, in July 2016. This evidence establishes that respondent actively participated in procuring the preparation and execution of the third amendment.
As for the second amendment, both parties also included in their exhibits an attorney client employment agreement between decedent and Groh, signed February 18, 2015 (less than a month before the execution of the second amendment) which states that decedent waived her [*10]confidential attorney-client privilege for respondent. The Court finds that this constitutes evidence that respondent participated in the preparation of the second amendment.[FN11]
Accordingly, the Court finds that petitioners have satisfied the second prong of the presumption of undue influence analysis.
With respect to the third prong of the presumption of undue influence analysis, there must be a showing that respondent would benefit unduly by the second and third amendments. "'The issue is not whether the beneficiary profited from the decedent's disposition of her estate; it is whether the profit was 'undue''" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], quoting Conservatorship of Davidson, 113 Cal App 4th at 1060). "A person 'unduly benefit[s]" when he or she receives a 'bequest that is ''unwarranted, excessive, inappropriate, unjustifiable or improper''" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], quoting Estate of Auen, 30 Cal App 4th at 311). "'To determine if the beneficiary's profit is 'undue' the trier must necessarily decide what profit would be 'due.' These determinations cannot be made in an evidentiary vacuum. The trier of fact derives from the evidence introduced an appreciation of the respective relative standings of the beneficiary and the contestant to the decedent in order that the trier of fact can determine which party would be the more obvious object of the decedent's testamentary disposition'" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], quoting Estate of Sarabia, 221 Cal App 3d at 607-608).
Here, the documentary evidence establishes that under the third amendment, respondent was left the entire trust, and under the second amendment, respondent was left the entire trust except for $25,000 to the Gramers. Prior to that, respondent was left $25,000 under the first amendment and nothing under the 2008 amended and restated trust. "The determination of an undue benefit 'is based on a qualitative assessment of the evidence, not a quantitative one'" (Hamlin v Jendayi, 105 Cal App 5th 1064 [2024], quoting Conservatorship of Davidson, 113 Cal App 4th at 1060). To that end, the Court considers the uncontroverted evidence that decedent had grandsons and great grandchildren that she was very fond of and maintained regular communication and visitation with over the years.[FN12]
That evidence, together with the pre-amendment trust provisions which provided respondent with nothing, leads this Court to find that the dispositions set forth in both the second amendment and third amendment leaving almost all of decedent's estate, and then her entire estate to respondent constituted an undue benefit to respondent (see Estate of Baker, 131 Cal App 3d 471, 481 [Cal Ct App 1982]). As petitioners have established an entitlement to a presumption of undue influence by showing that decedent and respondent had a confidential relationship, that respondent was involved in the preparation and execution of the trust amendments, and that respondent benefitted unduly as a result, the burden shifts to respondent to "produc[e] proof by a preponderance of evidence that the [*11][amendments were] not procured by undue influence" (Estate of Sarabia, 221 Cal App 3d at 605).
Having found that the presumption of undue influence applies, the Court considers respondent's case with respect to whether she has met her burden of affirmatively disproving, by a preponderance of the evidence, that the second and third amendments were the result of her undue influence over decedent (see Estate of Sarabia, 221 Cal App 3d at 605). Undue influence is "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity" (Cal Welf & Inst Code § 15610.70 [a]; see Cal Prob Code § 86). The Court considers the following factors in determining whether a result was produced by undue influence: (1) the vulnerability of the victim; (2) the influencer's apparent authority; (3) the actions or tactics used by the influencer, including controlling the victim's interactions with others and the use of affection; and (4) the equity of the result (see Cal Welf & Inst Code § 15610.70 [a]; Hamlin v Jendayi, 105 Cal App 5th 1064 [2024]).
Turning first to the vulnerability of decedent, petitioners' evidence established that decedent had lost several close family members in the years prior to the amendments at issue, that she was living alone with her beloved cat, and that she was in her late 70s and early 80s at the time the amendments were executed. This evidence is undisputed, thus, respondent failed to rebut this showing.
With respect to the influencer's apparent authority, the evidence established that respondent was in a confidential relationship with decedent. She testified that she spoke by phone with decedent every day, she was involved in decedent's estate planning, that she took decedent's house keys away from decedent's local friends and kept one for herself, and that she was named as decedent's agent under a power of attorney, health care proxy and co-trustee. Despite living across the country from decedent, she would offer caretaker services to decedent, including to come clean her home, change a lightbulb, and take decedent to appointments, although decedent had local friends who had helped her with such tasks.
As for the third factor, there was evidence that respondent took actions to control decedent's interactions with others and used affection to influence decedent. In addition to the testimony regarding respondent taking decedent's house keys back from her local friends and keeping one for herself, there was additional evidence of her attempts to isolate decedent by trying to limit decedent's communication with her family members. Annette testified that she called decedent on one occasion and respondent answered the phone and stated that decedent was sleeping. Annette asked for decedent to call her back, but she did not receive a call back. She called again and respondent answered again and said she was sleeping. Annette told her son Brent and asked him to call, and he had the same issue. She tried again a couple of days later and reached decedent, who said that respondent had just left. Annette asked if respondent had told decedent that she had called and decedent responded that respondent probably forgot to tell her.[FN13]
Annette testified that decedent asked her not to call when respondent was there. Given the overwhelming consensus among the witnesses that decedent craved regular telephonic communication from her family and friends, this evidence that respondent interfered with [*12]decedent's family's access to her and deprived decedent of that interaction weighs heavily in this undue influence analysis.
Respondent's use of affection toward decedent was evidenced by, among other things, her own testimony that, when asked if decedent told respondent why she was naming her as a beneficiary of her trust, respondent told decedent, "because you love me," and decedent responded, "you're absolutely correct." Respondent also told decedent she would build a room for her on respondent's home in New York, and that she would take care of decedent's beloved pet cat when she passed away. Although respondent generally denied having engaged in any behaviors that might constitute undue influence in her responses to a series of questions posed by her counsel, the Court considers respondent's conclusory testimony insufficient to rebut the presumption of undue influence. In addition, the Court had the opportunity to observe respondent over two days of testimony. Based on respondent's body language, lack of eye contact, facial expressions, and the inflection of her voice, the Court found respondent's "demeanor [to be] inconsistent with truthfulness" (People v Cotto, 92 NY2d 68, 76 [1998]; see Matter of Moak, 92 AD3d 1040, 1043 [3d Dept 2012], lv denied 19 NY3d 812 [2012]), and discredits her testimony to the extent it was conclusory, self-serving and inconsistent with her deposition testimony.
Finally, the Court considers the equity of the result. Here, as a result of the second and third amendments, almost all of decedent's assets were left to respondent instead of decedent's family members, as had been the testamentary plan in the 1994, 2008 and 2013 documents. This is so even though, by all accounts, she maintained loving relationships with her grandsons and their families. Accordingly, considering each of the factors, the Court finds that petitioners established entitlement to a presumption of undue influence, and respondent failed to meet her burden of affirmatively rebutting the presumption by a preponderance of the evidence, that the second and third amendments were the result of her undue influence over decedent.
Even if the Court did not find that petitioners established the presumption of undue influence, the Court would find that they have shown, by clear and convincing evidence, that the second and third amendments are the result of undue influence by respondent. As previously stated, petitioners "may establish undue influence by submitting either direct or circumstantial proof establishing, among other things, that '(1) [t]he provisions of the [trust] were unnatural[;] (2) the dispositions of the [trust] were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his [or her] freedom of will;' and (5) whether 'the person charged with undue influence was in fact active in procuring the execution of the instrument in question'" (Matter of Kosmo Family Trust [Wieland—Savino], 207 AD3d at 936-937, quoting Estate of Ventura, 217 Cal App 2d at 59-60 [internal quotation marks, ellipsis and citations omitted]; see Estate of Franco, 50 Cal App 3d at 382-383).
Here, with respect to the provisions of the trust being unnatural, that is, preferring strangers in blood to the natural objects of decedent's bounty (see Estate of Straisinger, 247 Cal App 2d 574, 586 [1967]), the second and third amendments did not provide for any of the natural objects of decedent's bounty, her children and grandchildren, unlike her earlier testamentary plans in the 1994 trust, 2008 trust, and 2013 first amendment. As for the dispositions of the trust amendments being at variance with the intentions of decedent, expressed both before and after [*13]their executions, it is clear that the terms of the second and third amendments disinheriting all of decedent's family members were inconsistent with decedent's prior plans to leave her assets to her family. For example, Laura and Janice Myers testified that decedent had repeatedly stated that she planned to leave her classic Ford Mustang vehicle to her grandson Steven. Despite this, Myers testified that the day after respondent died, someone came to decedent's house with a car carrier, put the Mustang on the car carrier and took it away. Respondent's testimony confirmed that the day after decedent died, respondent permitted a man to take the Mustang from decedent's garage, although she denied knowing who the man was or receiving any money from the transaction. In addition, Nancy Barrera testified that around 2015 or 2016 decedent told her that she left testamentary paperwork for Steven in the den of her house and that he was the executor. Barrera stated that decedent later said she had changed it to make respondent the executor. When Barrera questioned decedent about respondent, decedent said that respondent "was very helpful with her and that she had helped her daughter Claudia."[FN14]

Considering whether the relations existing between respondent and decedent afforded to respondent an opportunity to control the testamentary act, the evidence established that respondent and decedent had a confidential relationship wherein decedent placed her trust and confidence in respondent to the exclusion of her family and friends. The evidence discussed above regarding respondent's involvement in the estate planning process, the testimony about the repossession of decedent's house keys, and the obstruction of decedent's telephonic communication with her family members all show that respondent was afforded an opportunity to control the testamentary act by virtue of her confidential relationship with decedent.
Considering whether decedent's mental and physical condition was such as to permit a subversion of her freedom of will, there was ample evidence showing that decedent was increasingly mentally and emotionally vulnerable over the years, given her age and the loss of her close friends and family. In addition, with respect to decedent's physical health, Annette testified that decedent told her that respondent had offered to make a room for her in respondent's home in New York, to which Annette responded that she did not think that was a good idea because respondent's health was declining. Such evidence shows that decedent's mental and physical condition was and had been declining so as to permit a subversion of her freedom of will.
Finally, considering whether respondent was in fact active in procuring the execution of the instrument in question, the evidence established that respondent was involved in the preparation and execution of the second and third amendments, as she was listed on the retainer agreement for each amendment as a person with whom the attorney-client privilege was shared, was in communication with the estate attorney, visited the attorney's office and executed the third amendment as co-trustee. Thus, this factor has been established.
In conclusion, the Court finds that petitioners have established that the second amendment and the third amendment were executed as a result of undue influence imposed upon decedent by respondent, and respondent has failed to overcome petitioners' showing. Therefore, the second amendment and the third amendment are void, leaving the trust beneficiaries as set forth in the first amendment, dated July 23, 2013, that is, the residue of decedent's share of the [*14]trust shall be distributed to Brent and Steven after $25,000 general bequests to Jens Gramer and Sybille Gramer, and to respondent. With respect to respondent's general bequest, it is unclear to this Court whether that bequest may have already been satisfied by respondent's acquisition or receipt of decedent's assets other than the real property, such as jewelry, vehicles, or financial accounts. The parties may need to address respondent's distribution in the context of an accounting or other proceeding. Accordingly, it is hereby
ORDERED, ADJUDGED AND DECREED that the Third Amendment to the Kosmo Family Survivor's Trust, dated July 19, 2016, and July 25, 2016, is void; and it is further
ORDERED, ADJUDGED AND DECREED that the Second Amendment to the Kosmo Family Survivor's Trust, dated March 9, 2015, is void.
This constitutes the decision and order of the Court. You are hereby notified that this order has been entered this date in the office of the Clerk of Albany County Surrogate's Court. At the time of the filing of this decision and order, NYSCEF shall transmit by e-mail to the e-mail service addresses of record a notification that the decision and order has been filed and is accessible through NYSCEF. Such notice shall not constitute service of notice of filing or entry by any party (see Uniform Rules for Sur Ct [22 NYCRR] § 207.4a [h]).
Dated: December 23, 2024
Albany, New York
Hon. Stacy L. Pettit, Surrogate

Footnotes

Footnote 1:Although the death certificate lists the date of death as December 11, 2017, multiple witnesses testified that decedent's date of death was December 10, 2017.

Footnote 2:Attached to the 2008 amended and restated trust is a schedule of community property assets, which lists the following assets: (1) any stocks, bonds, mutual funds, brokerage accounts, promissory notes, amounts owing to trustor; (2) bank accounts, contents of safe deposit boxes; (3) all personal property, including but not limited to jewelry, clothing, furniture, home furnishings, family heirlooms, collectibles, appliances, motor vehicles, boats, and items of a similar nature, together with any insurance on such property; (4) any and all interest in the real property known as 4725 Elder Avenue, Seal Beach, CA 90740 together with any insurance on said property; (5) any and all interest in unimproved raw land located in imperial valley, CA together with any insurance on said property; (6) any and all prospective inheritance, gifts or bequests.

Footnote 3:All three amendments made by decedent stated that her trust estate included, in addition to all other residue, tangible personal property, jewelry, household contents, collector coins, her personal automobile, and a 1966 Ford Mustang automobile.

Footnote 4:California Probate Code §§ 16061.7 and 16061.8 provide, in relevant part, that a trustee shall serve a notification on the beneficiaries of the trust or the heirs of the deceased settlor when a revocable trust becomes irrevocable and that petitioners must make a claim within 120 days of such notice. Respondent provided no evidence of service of this notice upon petitioners Brent and Steven.

Footnote 5:Jurisdiction over this lifetime trust was proper in Albany County under SCPA 207 (1) (c) as the trustee — respondent — resides in Albany County. The trust owns a half interest in decedent's California residence, valued at approximately $800,000.

Footnote 6:Although petitioners, in their petition, requested the alternative relief of a constructive trust on the trust assets due to fraud imposed on decedent by respondent, no arguments were raised on this issue at trial or in the posttrial submissions; thus, the Court considers this request for relief to have been abandoned.

Footnote 7:Respondent objected to this testimony as hearsay. The Court finds that this testimony is admissible under the state of mind exception to the hearsay rule.

Footnote 8:With respect to decedent's cat, Barrera also testified as to the importance of decedent's cat to her. Barrera recalled that she was at decedent's house when first responders brought her to the hospital in December 2017, and when decedent saw Barrera, she mentioned her cat and Barrera assured her the cat would be taken care.

Footnote 9:Respondent objected to this testimony as hearsay; however, the Court finds that this evidence is admissible as an exception to this rule to show decedent's state of mind.

Footnote 10:The testimony established that respondent traveled to California twice in 2017 — once for a visit in October and again in December, when decedent passed away. She also testified that she was there for an appointment in Groh's office, which appears to have been sometime in spring 2016, since it involved the preparation of the third amendment. Accordingly, it seems that respondent only visited decedent in California one time between 2006 and 2015. There was no testimony that decedent ever traveled to visit respondent in New York.

Footnote 11:Although there was testimony suggesting that respondent was present in Groh's office for the preparation of the second amendment, and not the third, that conclusion was based on the time of year the amendments were executed. Other testimony regarding the substance of the discussion in Groh's office suggests that respondent was present for the preparation of the third amendment and the power of attorney.

Footnote 12:Although when asked at trial if decedent loved her grandchildren, respondent answered, "I have no idea," she was then presented with her 2020 deposition testimony where her response to the same question was "[s]he did." She then amended her response to "I would assume she did."

Footnote 13:Respondent objected to that part of Annette's testimony that referenced her conversation with decedent. The Court finds that the testimony is admissible as evidence of decedent's state of mind.

Footnote 14:The testimony of Laura and Janice Myers is admitted over respondent's hearsay objection as it shows decedent's state of mind.